**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Tara Wendt,

         Plaintiff,

v.

Charter Communications, LLC,

         Defendant.

Civ. No. 13-1308 (RHK/TNL)
**MEMORANDUM OPINION
AND ORDER**

Ashley R. Thronson, David E. Schlesinger, James H. Kaster, Nichols Kaster, PLLP, Minneapolis, Minnesota, for Plaintiff.

Jacqueline E. Kalk, John. H. Lassetter, Littler Mendelson, PC, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Tara Wendt alleges in this action that Defendant Charter Communications, LLC ("Charter") (a) discriminated against her on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08; (b) retaliated against her for engaging in protected conduct, in violation of Title VII and the MHRA; and (c) is liable for an assault and battery committed against her by one of its employees. Charter now moves for summary judgment, which, for the following reasons, will be granted in part and denied in part.

## BACKGROUND

The following facts are recited in the light most favorable to Wendt.

Wendt, a single mother of three daughters (ages 16, 11, and 9 in 2014), began working at Charter in Rochester, Minnesota, in September 2001. (Wendt Decl. ¶¶ 4-5.) She started as a customer service representative but was promoted to the workforce coordinator department in 2005, where she remained through 2013. (Schlesinger Aff., Ex. 22, 154-55.) In that role she scheduled the staffing of three departments in the call center. (Id., 152-53.)

The activities relevant to this Motion began in early January 2013. Around that time, Wendt was assigned a new manager, Steve Casey. (Id., Ex. 27, 114; id., Ex. 22, 123-24.) Starting in mid-January and continuing into the spring, Casey made sexually-charged comments to Wendt.[1] He told her to wear tighter shirts and pants so he could see her body. (Id., Ex. 4.) Commenting that whatever she paid for her breasts was worth it, Casey suggested she not wear a bra so he could see her nipples through her shirt. (Id.) He repeatedly asked her the type and color of her panties, mentioning that he could not see a panty line. (Id.) He said her scent was intoxicating and smelling her made him horny. (Id.) He told her that he would "have [her] in every way." (Id.) And he informed her that he would soon have an office without windows, which would eliminate the chance that someone would interrupt them when they were together. (Id.) Beyond these comments, Casey also told Wendt that she should do whatever he wanted because he was in charge and could make her pay. (Id.) Moreover, he told her several times he would write her up for insubordination if she did not do what he wanted. (Id.)

---

[1] Casey denies all of Wendt's allegations of sexual harassment. (Lassetter Aff., Ex. E, 96-98, 233, 247.)

On February 7, Casey and Wendt had a "one-on-one" meeting in Casey's office. When she stood next to him (at his request) to help him pull up a report on his computer, Casey ran his hand up the inside of her leg, touching her vagina over her pants and telling her he "can and will have that." (Id.) She responded by telling him not to touch her. (Id.) He replied that she should keep her mouth shut if she did not want to lose her job and he knew that as a single mother she was the sole income-earner for her family. (Id.)

About a week later, Casey and Wendt's former manager, Jeremy Borell, completed Wendt's 2012 performance review. (Lassetter Aff., Ex. D, 27.) Borell testified that he evaluated Wendt's 2012 performance (Lassetter Aff., Ex. D, 50), while Casey testified he typed the review into the computer system and wrote goals for Wendt's 2013 performance (Lassetter Aff., Ex. E, 137-39). Nevertheless, Casey emailed Borell on February 14, 2013, saying "I'm struggling how to score her," referring to Wendt. (Schlesinger Aff., Ex. 13, 1.) On February 15 at 8:40 p.m., Casey sent an instant message to Borell saying "thinking about how to score [Wendt] in accountability . . . thinking she'll get a 2 in that." (Schlesinger Aff., Ex. 14.)

Wendt received her review about two months later, on April 17, getting the lowest score of any workforce coordinator. (Schlesinger Aff., Ex. 23, 215; id., Ex. 6, 4; id., Ex. 4.) Because Charter assigned shifts according to performance-review results [2] (Lassetter Aff., Ex. D, 97), Wendt knew her scores would make her the last person to pick a shift, and ultimately she ended up with the shift she least wanted. (Schlesinger Aff., Ex. 7; id.,

---

[2] Until 2013, shift assignments for workforce coordinators had been made according to seniority, meaning Wendt, as the most senior member, was first to choose. (Id., Ex. 22, 123; id., Ex. 7.)

Ex. 23, 215.) Its timing—from 10:30 a.m. to 9:00 p.m. Wednesday through Saturday—made it more difficult for her to see her children. (Id., Ex. 30; id., Ex. 23, 327.) Her review also impacted the increase in her pay based on merit. (Id., Ex. 27, 68.) She received a merit increase of $0.44/hour, compared to her colleagues who received between $0.49/hour and $0.66/hour. (Farber Decl. ¶ 4.) Angry with her review, she asked Casey why she had scored so low, and he told her it was payback for refusing to submit to his sexual demands. (Schlesinger Aff., Ex. 23, 247.)

On April 23, a few days after receiving her review, Wendt reported Casey's sexual harassment to Charter. (Id., Ex. 5.) Wendt met with Liz Manning of human resources, telling Manning Casey had sexually harassed her and giving Manning a document she had prepared detailing each instance of harassment. (Id., Ex. 23, 256; id., Ex. 24, 19-20; id., Ex. 4.) Manning discussed the contents of the document with Wendt and then explained the investigation process to her. (Lassetter Aff., Ex. F, 103-04.) Manning began investigating that day. She interviewed Casey, who denied Wendt's allegations, and suspended him from work while the investigation was pending. (Id., Ex. G., Ex. 105, 6-10.) She later interviewed Wendt and Casey each a second time. (Id., 22-28.) Over the course of a few days, Manning also interviewed ten employees about Casey, including all the members of the workforce coordinator team that he managed. Further, she called Casey's former office, in Louisville, which informed her he had not been named in an ethics complaint there. (Id., 21.) Over the course of this investigation, Manning found no information corroborating Wendt's claim of sexual harassment, and she ultimately found Casey to be more credible. (Id., Ex. G, 104-07.)

4

Manning informed Wendt on April 29 that the investigation was closed and Casey would be coming back to work. (<u>Id.</u>, Ex. G, Ex. 105, 31.) Though Manning did not credit Wendt's claims, she nevertheless offered Wendt the opportunity to work for a new manager by transferring to a different job with the same salary and shift time. (Schlesinger Aff., Ex. 23, 242; Lassetter Aff., Ex. G, 180.) Wendt refused both because she viewed them as demotions. (Schlesinger Aff., Ex. 23, 244.) She instead continued as a workforce coordinator, and Casey continued to be her supervisor. (Lassetter Aff., Ex. E, 224.) A human resources representative was to be present during any one-on-one meetings between Wendt and Casey. (<u>Id.</u>, Ex. E, 224.)

After the April investigation concluded, Casey continued to have contact with Wendt. He made facial and body gestures, including smirks and winks, that Wendt interpreted as leering and "look[s] of satisfaction and knowing he got away with something." (Schlesinger Aff., Ex. 22, 112.) He also brushed against Wendt a number of times, which she believed was intentional. (<u>Id.</u>, 50, 111-12.) On July 26, 2013, Casey stopped by her work space, where she was alone, and told her "he knew that he had gotten away with it" and "they wouldn't believe a slut like [Wendt]." (<u>Id.</u>, Ex. 23, 287-88.)

Wendt reported Casey's continuing behavior to Charter on September 11, 2013. (<u>Id.</u>, 290.) Manning immediately opened a new investigation, but was unable to substantiate Wendt's claim. (Lassetter Aff., Ex. G, Ex. 106, 11; <u>id.</u>, Ex. G, 172.) Wendt was not informed of the results of the investigation. (Schlesinger Aff., Ex. 23, 290.)

Wendt filed a Charge of Discrimination with the Equal Employment Opportunity Commission, receiving a Right to Sue letter on May 21, 2013.  She then filed this action against Charter.  She asserts five counts in her Complaint: sex discrimination under Title VII (Count 1); sex discrimination under the MHRA (Count 2); retaliation under Title VII (Count 3); retaliation under the MHRA (Count 4); and assault and battery (Count 5).  Charter now moves for summary judgment.  The Motion, having been fully briefed and the Court having heard oral argument on November 21, 2014, is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  Charter bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to Wendt. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  Wendt may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

I.   Sex Discrimination

Wendt brings claims for sex discrimination under Title VII and the MHRA. Both statutes prohibit employers from discriminating against a person because of sex.[3] 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.08, subd. 2. The same standards apply to both laws, and the Court will therefore address the claims together. Rasmussen v. Two Harbors Fish Co., 832 N.W.2d 790, 796 (Minn. 2013). In her brief, Wendt clarifies that she alleges both a *quid pro quo* and a hostile-work-environment claim. Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026-27 (8th Cir. 2004).

Charter's sole argument is that it cannot be liable in light of the Faragher-Ellerth defense. That defense bars employer liability on sex-discrimination claims when the plaintiff did not suffer a tangible employment action and the defendant can show 1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and 2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998); see also Bush v. Penske Truck Leasing Co., LP, Civ. No. 06-1110, 2007 WL 1321853, at *3 (D. Minn. May 4, 2007) (Kyle, J.) (holding the Faragher-Ellerth defense applies to the MHRA).

---

[3] Title VII makes it unlawful to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 USC § 2000e-2(a)(1). The MHRA similarly prohibits "an employer, because of . . . sex . . . [from] discriminat[ing] against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2.

The threshold question is whether Wendt suffered a tangible employment action, and in the Court's view, taking the facts in the light most favorable to Wendt, she did. A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc., 524 U.S. at 761. In most situations, it "inflicts direct economic harm." Id. at 762. Wendt claims she suffered a tangible employment action as a result of the low performance evaluation Casey gave her for opposing his sexual advances.

Charter responds that Casey did not influence Wendt's performance review at all. But he did email Borell on February 14, 2013, saying "I'm struggling how to score her," referring to Wendt. (Schlesinger Aff., Ex. 13, 1.) On February 15 at 8:40 p.m., Casey sent an instant message to Borell saying "thinking about how to score [Wendt] in accountability . . . thinking she'll get a 2 in that." (Id., Aff., Ex. 14.) Casey also told Wendt that her low review was payback for refusing to submit to his sexual demands. (Id., Ex. 23, 247.) Those statements, taken in the light most favorable to Wendt, suggest that Casey *did* influence Wendt's performance review for 2012.

Looking to potential tangible employment actions, then, Wendt's low performance review, on its own, did not constitute a tangible employment action because it was not a change in employment status. But the low pay increase Wendt received as a result of that review was a tangible employment action. The score she received on her performance review influenced her pay raise, and because she received a lower score than everyone else, her increase in pay was only $0.44/hour, while her colleagues' increases ranged

8

from $0.49/hour to $0.66/hour. (Farber Decl. ¶ 4.) That is, her raise was between $2.00 and $8.80/week less than her coworkers. It cannot seriously be disputed that Wendt suffered "direct economic harm" from the low review and therefore suffered a tangible employment action. Burlington Indus., Inc., 524 U.S. at 761.

There being a tangible employment action, taking the facts in the light most favorable to Wendt, Charter cannot at this stage make out the Faragher-Ellerth defense. Burlington Indus., Inc., 524 U.S. at 765; Faragher, 524 U.S. at 807. As such, the Court will deny summary judgment on Counts 1 and 2.

II.   Retaliation

Wendt also brings retaliation claims under Title VII and the MHRA. Both laws prohibit an employer from discriminating against an employee because the employee opposed a practice made unlawful by the respective laws. 42 U.S.C. § 2000e-3; Minn. Stat. § 363A.15(1). [4] As with sex-discrimination claims, retaliation claims under Title VII and the MHRA are analyzed using the same standards, and the Court will address them together. Guimaraes v. SuperValu, Inc., 674 F.3d 962, 977 (8th Cir. 2012).

Wendt can defeat summary judgment on her retaliation claim through direct or indirect evidence. To do so with direct evidence, she must present "evidence that demonstrates a specific link between a materially adverse action and the protected

---

[4] Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. The MHRA prohibits "any individual who participated in the alleged discrimination . . . from intentionally engag[ing] in any reprisal against any person because that person [] opposed a practice forbidden under this chapter." Minn. Stat. § 363A.15(1).

9

conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir. 2011).  Here, Wendt argues she can do so.

  First, she contends—and Charter does not dispute—that she engaged in protected conduct.  When Casey allegedly sexually assaulted her and told her "he [would] have that," she told him to stop touching her.  (Schlesinger Aff., Ex. 4.)  Telling a supervisor to stop offensive conduct is protected.  Ogden v. Wax Works, Inc., 214 F.3d 999, 1007 (8th Cir. 2007); Lopez v. Aramark Unif. & Career Apparel, Inc., 426 F. Supp. 2d 914, 940 (N.D. Iowa 2006).

  Second, Wendt argues she suffered a materially adverse employment action.  A materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  The action cannot be trivial; it "must produce some injury or harm."  AuBuchon v. Geithner, 743 F.3d 638, 644 (8th Cir. 2014) (internal quotations omitted).  Courts in this Circuit often suggest that the harm must be connected to the job.  E.g., id. at 645 ("Webster's warnings did not result in sufficient 'injury or harm' because he never threaten[ed] termination or any other employment-related harm."); Hill v. City of Pine Bluff, Ark., 696 F.3d 709, 715 (8th Cir. 2012) (holding there was no materially adverse employment action because plaintiff "suffered no loss of pay, reduction in hours or responsibilities, or exclusion from training and advancement opportunities").  Nevertheless, the Supreme Court explained that an

action satisfying the Burlington Northern standard is not limited strictly to economic harm and depends on the context. Burlington N., 548 U.S. at 63, 69.

Here, as in the discrimination context, Wendt's poor performance review by itself does not constitute a materially adverse employment action. Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 752 (8th Cir. 2009). However, the consequences flowing from the review do. As explained above, the lower pay increase resulting from the poor performance review harms Wendt. A real economic injury, it is directly related to her employment. That alone may be enough to constitute a materially adverse employment action. But additionally, in the context of Wendt's life, her shift change kept her from seeing her children on the days she worked; she arrived home after they went to bed and woke up after they left for school. (Schlesinger Aff., Ex. 23, 327.) Losing time with her children is more than a trivial harm. See Burlington N., 548 U.S. at 69 (recognizing that "a schedule change . . . may matter enormously to a young mother with school-age children"). There is at least a question of fact here about whether, had she known she would suffer these economic and personal consequences, she would have been dissuaded from rejecting Casey's advances, the lynchpin of "materiality" for a retaliation claim.

Finally, Wendt argues there is evidence of a specific link between the protected activity and the materially adverse employment action that supports a finding that the shift change and diminished pay increase were retaliatory. When Wendt asked Casey why her performance review was low, he told her "[she] was getting what he told [her] he would do, that if [she] didn't submit to his sexual advances, that he would make [her] pay for it, and this is what he said would happen." (Schlesinger Aff., Ex. 23, 247.) In the

11

Court's view, this statement demonstrates a direct link between Wendt's rebukes of Casey's sexual advances and her low performance review that led to her lower pay raise and shift change. Accordingly, the Court will deny summary judgment on Claims 3 and 4 of the Complaint, the Title VII and MHRA retaliation claims.

III.   Assault and Battery

Wendt finally claims Charter is liable for assault and battery under Minnesota law. Charter argues this claim is barred by the Minnesota worker's compensation act (WCA), which provides that an employer "is liable to pay compensation in every case of personal injury or death of an employee arising out of and in the course of employment." Minn. Stat. § 176.021. This liability "is exclusive and in the place of any other liability to such employee." Id. § 176.031.

Under the "assault exception," however, the WCA does not apply to "an injury caused by the act of a . . . fellow employee intended to injure the employee because of personal reasons, and not directed against the employee as an employee, or because of the employment." Id. § 176.001, subd. 16. As the undersigned has explained, the assault exception is narrowly construed and applies "only if the assailant was motivated by reasons arising from circumstances wholly unconnected with [victim's] employment." Mennis v. Prime Hospitality Corp., Civ. No. 03-4191, 2004 WL 1987229, at *12 (D. Minn. Sept. 7, 2004) (Kyle, J.). The two leading cases from the Minnesota Supreme Court demonstrate the narrowness of the exception. In McGowan v. Our Savior's Lutheran Church, a director of a homeless shelter at a church was raped by a client in her office. 527 N.W. 2d 830, 831 (Minn. 1995). She sued the church, and the Minnesota

12

Supreme Court held the assault exception did not apply—thus her injuries were covered by the WCA—"because [her injuries] resulted from an assault arising solely out of [her] activities as an employee." Id. at 834.  The court held so because "the assault occurred during working hours, in her office, while she was directly engaged in the performance of her work duties." Id.  In Meintsma v. Loram Maintenance of Way, Inc., the plaintiff was injured by a ritual "birthday spanking" with a wooden paddle from his coworkers. 684 N.W.2d 434, 437 (Minn. 2004).  As in McGowan, the court held the assault exception did not apply because the motivation arose from plaintiff's role as an employee, not personal animosity.  Id. at 441.  The spanking occurred during working hours, plaintiff had "no meaningful contact with the co-employees outside the workplace, there [was] no evidence of personal animosity towards Meintsma, and other employees were spanked in the same manner on their birthdays." Id.

    Here, Wendt's assault arose out of her duties as an employee.  Casey touched her during a one-on-one meeting in his office, during working hours, when he asked her to stand near him to help him pull up a report on his computer.  (Schlesinger Aff., Ex. 4.)  These meetings were a regular part of Wendt's job, such that HR created a special accommodation (having an HR representative present during future meetings) to enable them to continue after Wendt complained of sexual harassment.  (Lassetter Aff., Ex. E, 224.)  There is no evidence Casey and Wendt had a personal relationship outside of work.  Therefore, the assault exception does not apply and the WCA, as the exclusive source of employer liability, bars Wendt's assault and battery claim.  Summary judgment will be granted to Charter on Count 5.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 104) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, summary judgment is

(1) **GRANTED** as to Count 5 (Assault and Battery), which is **DISMISSED WITH PREJUDICE**; and

(2) **DENIED** as to Counts 1-4 (Sex Discrimination and Retaliation), which remain for trial.

Date:  December 23, 2014

s/Richard H. Kyle<br>
RICHARD H. KYLE<br>
United States District Judge
